UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:10-CV-102-F

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
          Plaintiff, )
 )
and )
 )
LEE LARAVIERE-STEELE, )
DARRELL STEELE, )
          Intervenor Plaintiffs, )
       vs. )          ORDER
 )
SAFELITE GLASS CORP., )
and )
GREGORY K. BYRD, )
          Defendants. )

      This matter is before the court on the Motion for Summary Judgment [DE-37] filed by

Defendants Safelite Glass Corporation and Gregory K. Byrd. Plaintiff Equal Employment

Opportunity Commission ("EEOC") and Plaintiff-Intervenors Lee LaRaviere-Steele and Darrell

Steele have filed separate responses, and Defendants have replied. The motion is therefore ripe for

ruling.

## STATEMENT OF THE FACTS[1]

### A. Safelite and the Associated Services Department

Defendant Safelite Glass Corporation ("Safelite") is a national provider of auto glass products and services and has retail facilities and distribution centers in all fifty states. It also operates a manufacturing facility in Enfield, North Carolina, which currently employs approximately 200 individuals and manufactures windshields that are ultimately installed on the vehicles of Safelite customers.

During 2007 and 2008, the senior manager at the Enfield facility was Assistant Vice President for Manufacturing and Distribution Rich Glover ("Glover"). Reporting to Rich Glover were Operations Manager Tony Roach ("Roach") and Facility Controller, Mike Bradsher ("Bradsher"). Defendant Gregory K. Byrd ("Byrd") was the Associated Services ("AS") Manager responsible for the human resources functions at the Enfield facility. Byrd reported to Brenda Downing ("Downing") Director of Human Resources, in Safelite's Columbus, Ohio, headquarters.

Prior to 2004, Byrd had been responsible for the human resource functions at only the Enfield

---

[1] The court sets forth the facts in the light most favorable to the EEOC and LaRaviere-Steele. In so doing, however, the court has relied only upon admissible evidence. *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."). For this reason, the court has not recounted facts which rely upon inadmissible hearsay. *See Maryland Highways Contractors Ass'n, Inc. v. State of Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)(explaining that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment). For example, LaRaviere-Steele and the EEOC maintain that LaRaviere-Steele often worked at home on Mondays when Byrd would be returning to the office. The evidence relied upon to support that assertion is LaRaviere-Steele's March 6, 2008, email to Brenda Downing, and Downing's notes of a March 20, 2008 interview with LaRaviere-Steele. LaRaviere-Steele's statements in each of these documents are hearsay. FED.R.EVID. 801(c)(defining hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

facility. In 2006, Byrd was given significant additional responsibilities which required him to provide human resources support to Safelite's facilities through the eastern and southeastern states. His additional duties required him to spend the majority of his time traveling to various Safelite locations within his territory, although his "home" office remained in Enfield.

Because his new role necessitated that he be away from the Enfield facility, Byrd was no longer able to provide the day-to-day human resources support and services to the Enfield facility. In 2007, Safelite created a new position, AS Supervisor, whose function was designed to provide day-to-day human resources support to Glover, Bradsher, and Roach in the Enfield facility.

**B. Lararviere-Steele is hired by Safelite**

After interviewing for the AS Supervisor position with members of the Enfield management team, including Glover, Bradsher, Roach and Byrd, Laraviere-Steele was hired in January 2007. Laraviere-Steele was responsible for providing day-to-day human resources support to the managers and supervisors in Enfield, as well as handling labor relations, benefits questions, disciplinary issues, and recruiting issues. As part of her employment as the AS Supervisor, Laraviere-Steele was familiar with Safelite's policies and procedures, reviewed the policies with Safelite employees periodically throughout their employment, and enforced those policies as needed. She reported directly to Byrd and also had reporting responsibilities to Glover.

**C. LaRaviere-Steele's interactions with Byrd**

LaRaviere-Steele contends that in February or March of 2007 and continuing until February 2008, Byrd directed inappropriate remarks and behavior towards her. Byrd complimented LaRaviere-Steele "a couple of times" on her eyes, appearance and hairstyle. *See* Dep. of LaRarviere-Steele [DE-44-2] at p. 178. LaRaviere-Steele also contends Byrd also told her she looked "damn

3

good" and "nice" a couple of times. LaRaviere-Steele at first was not troubled by Byrd's comments, but as time went on, she no longer welcomed them.

According to LaRaviere-Steele, Byrd also asked her inappropriate questions. She contends that on at least two occasions, Byrd asked her if she was "gray down there." LaRaviere-Steele testified that in response to the first question, she may have laughed it off and tried to change the subject, but after Byrd asked her a second time, she said "No, and stop asking me." Dep. of LaRaviere-Steele [DE-44-2] at p. 179. Byrd also questioned her several times about the color of her panties, and asked her on at least one occasion to stick out her tongue. LaRaviere-Steele contends she never answered Byrd.

LaRaviere-Steele also contends that Byrd commented at least once on her breasts, telling her they looked nice while he stared at her chest. On another occasion, Byrd told LaRaviere that he would like to touch her breasts while both of them were sitting in a truck. LaRaviere got out of the vehicle. She also maintains that he would routinely stare at her chest, prompting her to remark, "Hey, I'm up here." Dep. of LaRaviere-Steele [DE-44-2] at p. 183.

LaRaviere-Steele contends that Byrd also inappropriately touched her. On one evening in 2007, Byrd entered the copyroom after LaRaviere-Steele and bent down to attempt to kiss her. LaRaviere-Steele said "don't," pushed Byrd away, and then left the facility. On at least two occasions, Byrd ran his fingertips up her back and over her shoulders, and asked, "You closing in the front or back today?" in reference to her bra. Dep. of LaRaviere-Steele [DE-44-2] at pp. 185-87. On another occasion, after LaRaviere-Steele entered Byrd's office, he asked her to look at his computer screen. When she did so, Byrd ran his finger up the inside of LaRaviere-Steele's pantleg to about five inches below the zipperline of her pants. LaRaviere-Steele then physically moved away

4

from him. Another employee, Loretta Roberson, saw LaRaviere-Steele after this incident and noted she looked upset. LaRaviere-Steele told Roberson what happened.

On May 7, 2007, LaRaviere-Steele was coordinating and preparing for a Safelite management meeting to be held that evening at the Gateway Center Holiday Inn. Byrd told another employee that he and LaRaviere-Steele were leaving, and then told LaRaviere-Steele to follow him in her vehicle. She did so, and he led her to the hotel. When she arrived, she threw her hands up in the air and asked, "What's this?" Dep. of LaRaviere-Steele [DE-44-2] at p. 198. Byrd told her to "come on" and entered the hotel room. Byrd explained that it was noisy at the Enfield facility, and they could talk at the hotel. In the room, they both sat on chairs and discussed a variety of work issues for approximately 20 minutes. Byrd then got up from the desk, sat on the bed, and asked LaRaviere-Steele to sit with him. When she refused, he tried to pull her onto his lap. LaRaviere-Steele left the room, and Byrd followed her outside and said he was sorry. LaRaviere-Steele then called a subordinate, Loretta Roberson, and asked her to meet her at the management location with needed supplies. According to LaRaviere-Steele, she was upset and crying, and told Roberson what happened.

On another occasion, Byrd called LaRaviere-Steele and asked her to meet him after work hours in the parking lot of a local college and deliver some work-related materials he needed. When LaRaviere arrived, Byrd requested that she get into his vehicle and LaRaviere complied with his request. The two began to discuss work-related issues. During their discussion, Byrd commented that LaRaviere-Steele smelled nice. He then moved his vehicle because he didn't want to be seen by his daughter's boyfriend who was in the area. Byrd then attempted to kiss LaRaviere-Steele and

5

touch her breast. LaRaviere-Steele told Byrd, "no," exited his vehicle, and then left in her own vehicle.

Other than her comments to Loretta Roberson, LaRaviere-Steele did not report Byrd's behavior to any employee or manager at Safelite, despite the company maintaining an anti-harassment policy and complaint procedures. The policy encouraged employees to report harassment or other inappropriate conduct, and specifically allowed employees to report incidents to their supervisor, their supervisor's supervisor, or the AS department. Under the policy, supervisors and managers were required to report any incidents of harassment to the AS department or the Safelite Ethics Hotline. LaRaviere-Steele contends she never called the Ethics Hotline because she thought Byrd helped Downing with checking the voicemail system, and he would hear her complaint.

LaRaviere-Steele did, however, tell Woodrow Harper, a security guard employed through an outside company who was assigned to the Enfield facility, about at least one incident with Byrd. On February 18, 2008, Harper observed LaRaviere-Steele looked like something was wrong with her, so he asked her if she was okay. LaRaviere-Steele became quiet, and then followed Harper into his office and told him that Byrd had asked her the color of her panties. Harper asked LaRaviere-Steele if there was anything he needed to do about it, because Harper reported to her. LaRaviere-Steele told Harper he didn't need to do anything, but Harper completed an Incident Report as was required by his employer. Harper was shocked by what LaRaviere-Steele told him.

### D. LaRaviere-Steele's Performance at Safelite

During LaRaviere-Steele's tenure at Safelite, she was responsible for generating several reports to be used by Enfield managers. These reports included (1) weekly staffing reports that allowed the management team to identify departments which required additional staffing or those

6

which were overstaffed, (2) monthly attendance reports, needed by Bradsher to determine incentive bonus payments to employees, and (3) workplace injury reports. All of these reports frequently contained inaccuracies, which caused problems for various managers, including causing errors in incentive bonus pay for employees. Many of the managers complained to Byrd about the reports being inaccurate, but at least one manager, Bradsher, recalls problems with the various reports preceding the period of LaRaviere-Steele's employment at Safelite.

Managers at Safelite also had concerns about Laraviere-Steele's relationship with the Union President and other Union officials. Byrd observed Laraviere-Steele in frequent closed-door meetings with Union officials and Glover felt that the Union President was monopolizing Laraviere-Steele's time which prevented her from focusing on other tasks. Glover told Laraviere-Steele to keep the Union President out of her office; Byrd counseled Laraviere-Steele to keep an arms length relationship with Union officials.

Glover also felt that LaRaviere-Steele was ineffective in making decisions and solving problems. Glover felt that rather than solving problems presented by employee complaints, LaRaviere-Steele became merely a conduit for reporting issues to other managers. Roach felt that LaRaviere-Steele had a tendency to exaggerate, and Byrd has testified that Glover complained to him about LaRaviere-Steele exaggerating about what work she had to do.

Glover eventually determined that LaRaviere-Steele was struggling, so toward the end of 2007, or possibly in the beginning of 2008, he asked her to prepare a list of the specific tasks she had to complete in her job. His goal was to help her prioritize certain tasks and perhaps reassign tasks to other employees. LaRaviere-Steele never provided Glover with the list. Nevertheless, at some point, some functions previously assigned to LaRaviere-Steele were transferred to the Accounting

7

Department. LaRaviere-Steele did not agree with the decision to transfer the duties, and Bradsher felt that LaRaviere-Steele was not working amicably with at least one of the employees he supervised in the Accounting Department. Bradsher communicated his concerns to Byrd, who maintains he discussed them with LaRaviere-Steele.

In late February 2008, Bradsher directed LaRaviere-Steele to review and verify that certain associates listed on the monthly attendance report were on valid leaves of absences to allow the company to issue incentive checks to employees. When LaRaviere-Steele did not complete the task, Bradsher asked her again to do so. He then asked LaRaviere-Steele to come to his office, and LaRaviere-Steele questioned why she had to complete the task. She then told Bradsher she could not complete the task, and Bradsher told her she was being insubordinate. LaRaviere-Steele left the meeting in tears. Bradsher contacted Byrd and told him about the incident, and informed Byrd that if he was not going to be back in the building, Bradsher would handle it. Byrd assured Bradsher he would take care of it.

LaRaviere-Steele contends that neither Byrd nor any other manager at Enfield ever counseled or expressed dissatisfaction with her job performance. She notes that Safelite maintains a "Counseling and Corrective Action Policy" that states "formal corrective action will be taken" when "an associate is not meeting job expectations, has a poor or disruptive attitude, or is any way hindering the productivity of his or her fellow associates, or is in violation of company policies or practices." The Policy also provides, in pertinent part, the following:

> Typically, the corrective action is a progressive process, however, depending on the circumstances, Safelite Group may, at its discretion, start the corrective action process at any step in the sequence. The steps include:
> - Counseling discussion
> - Written notice
> - Final written notice with possible suspension

8

. . .

If corrective action has been put in place but has not corrected the issue it may be necessary to terminate the associate from our company.

The Corrective Action Notice form is used to document the counseling and corrective action policy.

Counseling and Corrective Action Policy [DE-44-7]. The policy includes the "Corrective Action Notice" along with detailed instructions, which include the directive to document all verbal warnings in writing. There is no documentation of any corrective action or verbal counseling regarding LaRaviere-Steele's performance.

### E. LaRaviere-Steele complains to Roach and is eventually fired

On the evening of Monday, March 3, 2008, LaRaviere-Steele called Roach, the Operations Manager, on his mobile phone. During the conversation, LaRaviere-Steele told Roach she was thinking about resigning because she couldn't take it anymore. When Roach questioned LaRaviere-Steele why, she told him that (1) Glover had asked her to give away the reports so that she could work on more "strategic stuff", (2) Bradsher was asking her to do something she already had completed, again, and (3) Byrd had been harassing her. Roach asked her about the harassment, and LaRaviere-Steele told him that Byrd had asked her about the color of her underwear. Roach told LaRaviere-Steele that he would take care of it.[2]

LaRaviere-Steele did not go to work on March 4, 2008, because she had the flu. Roach did go to work at Safelite, however, and told Byrd about his conversation with LaRaviere-Steele. Both men deny discussing any accusations of sexual harassment during the conversation. On the afternoon of March 4, Byrd called LaRaviere-Steele and told her to stay home on March 5, as well.

---

[2] Roach denies that LaRaviere-Steele told him anything about sexual harassment during the conversation.

On Wednesday, March 5, Byrd called Downing to advise her that he wanted to terminate LaRaviere-Steele's employment and get Downing's agreement to do so. Downing recalls Byrd telling her that LaRaviere-Steele wasn't doing what he asked; wasn't supporting managers while he was gone from Enfield and was combative. Based on Byrd's description of the situation, Downing agreed that termination was appropriate. Byrd maintains that the decision to terminate LaRaviere-Steele "was in conjunction with myself, Brenda Downing and Rich Glover." Dep. of Greg Byrd [DE-44-15] at p. 179. Glover, for his part, cannot recall if Byrd discussed terminating LaRaviere-Steele's employment with him prior to her termination, but maintains Byrd would not need his permission to terminate her employment.

In any event, on March 6, 2008, LaRaviere-Steele reported to work at Safelite. Byrd called her into his office, and told her she was being terminated because she was no longer a good fit for the company. When she questioned what he meant, he repeated that she was not a good fit, and statedhe was disappointed in her for talking to Roach.

## F. LaRaviere-Steele complains to Downing

That afternoon, LaRaviere-Steele sent an email to Downing complaining that she had been terminated because she had complained about Byrd's harassment to Roach. LaRaviere-Steele informed Downing that she had witnesses and proof of what happened. Two weeks later, Downing spoke to LaRaviere-Steele on the telephone about her sexual harassment complaint and the circumstances of her termination. During the conversation, LaRaviere-Steele identified Security Guard Woodrow Harper and former Associate Services Assistant Loretta Roberson as witnesses with knowledge of Byrd's harassment. At Downing's request, LaRaviere-Steele provided additional details about Byrd's inappropriate conduct in an email.

Downing conducted an investigation into LaRaviere-Steele's complaint in which she took statements from LaRaviere-Steele, Byrd, Roach, Glover, Bradsher and Bradsher's subordinate, Christy Deaton. Downing did not interview Loretta Roberson or Woodrow Harper. Downing did not interview Loretta Roberson because LaRaviere-Steele indicated she had told Roberson about Byrd's harassment, but Roberson had not witnessed anything first hand. LaRaviere-Steele also told Downing that she wasn't sure Roberson would talk with Downing because Byrd had made LaRaviere-Steele fire Roberson from Safelite. Downing did not interview Woodrow Harper because he was not working at the Enfield facility on the day that Downing visited. After her investigation, Downing concluded there was no credence to LaRaviere-Steele's claims of sexual harassment. On April 23, 2008, Downing sent LaRaviere-Steele a letter in which she wrote: "After investigating and speaking with individuals you named, it is found that the evidence you brought forward is inconclusive. The company will determine what, if any, preventative measures will be taken." April 23, 2008 Letter [DE-44-11]. Downing took no corrective action in response to LaRaviere-Steele's complaint.

## G. Effect on LaRaviere-Steele

LaRaviere-Steele contends she suffered during her employment at Safelite, and her suffering was exacerbated by her termination of employment from Safelite, and the resulting financial hardships she and her family had to endure. She contends her heightened distress began to manifest itself in the following ways: (1) she stayed in bed; (2) she did not want to eat; (3) she did not want to get dressed; (4) she did not want to play with her child; (5) she was crying all the time; (6) she stopped going in public and socializing with others; (7) she withdrew from her husband and avoided physical contact with him; (8) she suffered body aches and chest pains; and (9) she had trouble

11

sleeping and began using sleeping pills. LaRaviere-Steele eventually attempted suicide by ingesting approximately 30 sleeping pills during the late summer or early fall of 2009.

## STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## ANALYSIS

Safelite and Byrd contend they are entitled to summary judgment on all of Plaintiffs' claims.

### A. Retaliation in violation of Title VII

The court first addresses the Plaintiffs' claims for unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964. That statute prohibits employers from taking adverse action against employees in retaliation for employee reports of harassment or discrimination. 42 U.S.C. § 200e-3(a). Ordinarily, a plaintiff may establish a Title VII retaliation claim under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

12

First, a plaintiff bears the burden of establishing a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the employer's proffered reasons are pretextual or her claim will fail. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) her employer took an adverse action against her; and (3) a causal connection exists between the protected activity and the asserted adverse action. *King v. Rumsfeld*, 328 F.3d 145, 151-52 (2003). Here, Safelite does not appear to dispute that LaRaviere-Steele engaged in a protected activity–complaining about Byrd's alleged harassment to Roach–or that she suffered an adverse action–the termination of her employment. Rather, Safelite argues that the EEOC and LaRaviere-Steele cannot establish a causal connection between the protected activity and her termination because none of the actual decisionmakers–Byrd, Downing or Glover–were aware of her complaint of sexual harassment.

It is well-settled that a decision-maker's knowledge that a plaintiff engaged in a protected activity "is absolutely necessary to establish the third element of the prima facie case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Safelite argues this knowledge cannot be established because Byrd already had terminated LaRaviere-Steele's employment by the time she complained to *Downing* about harassment. Were LaRaviere-Steele's post-termination email to Downing the only evidence of her complaints about Byrd's actions, the court would be inclined to agree with Safelite. The record evidence also shows, however, that

13

LaRaviere-Steele complained to Roach about Byrd's alleged harassment on March 3, 2005. The following day, on March 4, 2005, Roach told Byrd about his conversation with LaRaviere-Steele. On March 6, 2005, Byrd terminated LaRaviere-Steele's employment, ostensibly with input from Downing and Glover.

Safelite argues, nevertheless, that there is no proof that Roach told Byrd about LaRaviere-Steele's allegations of sexual harassment. Given that Byrd admits that Roach told him about LaRaviere-Steele's March 3, 2008 conversation, however, the court concludes that a reasonable jury–if it credits LaRaviere-Steele's testimony that she told Roach that Byrd was harassing her–could infer that Roach included LaRaviere-Steele's allegations of harassment in his relaying of the conversation to Byrd. Moreover, close proximity between protected activity and an adverse action has been held to satisfy the causation element of the prima facie case. *See Williams v. Cerberonics*, 871 F.2d 452, 457 (4th Cir. 1989). Again, the jury can draw the inference that Byrd learned of LaRaviere-Steele's allegations of harassment on March 4, 2008, and made the decision to terminate her employment two days later. This suffices to establish a prima facie case of retaliation.

The burden of production now shifts to Safelite to proffer a legitimate, non-retaliatory reason for her termination. This it has done: it has identified poor performance as the reason for her termination. The burden now shifts back to the EEOC and LaRaviere-Steele to show "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "This burden now merges with the ultimate burden of persuading the court that she has been the victim of [retaliation]." *Id.* at 256. The plaintiff may meet this burden by "either directly by persuading the court that a discriminatory reason more likely motivated the

14

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

The court finds that the EEOC and LaRaviere-Steele have met their burden in showing a genuine issue of material fact exists as to whether a retaliatory reason more likely motivated Safelite to terminate LaRaviere-Steele's employment. Although it is true that temporal proximity, standing alone, is often insufficient to establish a jury question regarding pretext, *see Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1983), temporal proximity may still be considered when determining whether a plaintiff has established a jury question regarding pretext. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 122, 143 (2000)(explaining that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual")(internal quotation omitted). Here, in addition to the strikingly close proximity between LaRaviere-Steele's complaint to Roach and Byrd's decision to terminate her employment, the EEOC and LaRaviere-Steele also proffer Byrd's comments to LaRaviere-Steele during her termination that he was disappointed in her for talking to Roach. If the jury draws the inference that Roach told Byrd about LaRaviere-Steele's sexual harassment complaint, Byrd's comment to LaRaviere-Steele is strong circumstantial evidence regarding Byrd's motivation. *See, e.g., EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 408 n.12, 408-09 (4th Cir. 2005)(finding evidence showing that an employee who, after refusing to take part in a scheme to illegally retaliate against another employee, was warned she was "doing herself in" and later told she should be searching for new employment to be significant evidence of pretext).[3] Accordingly, the

---

[3] Much less compelling is the EEOC's arguments regarding Byrd's failure to document any counseling session or disciplinary action taken against LaRaviere-Steele, in light of the fact that the EEOC points to no evidence that Byrd documented any counseling session or disciplinary action of

15

court concludes that the close temporal proximity between LaRaviere-Steele's complaint to Roach and Byrd's decision to terminate her employment, coupled with Byrd's statement to LaRaviere-Steele that he was disappointed in her for talking to Tony Roach, is sufficient evidence from which a jury could find that an illegal retaliatory reason more likely motivated the decision to terminate LaRaviere-Steele's employment. Safelite's Motion for Summary Judgment [DE-37] is DENIED as to the retaliation claims.

## B. Hostile Work Environment Claim under Title VII

The EEOC and LaRaviere-Steele also allege claims for unlawful discrimination on the basis of a hostile work environment in violation of Title VII.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] . . . terms, conditions or benefits of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII is violated "[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). To establish a claim for a hostile work environment on the basis of sex in violation of Title VII, a plaintiff must prove "that the offending contact (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Spicer v. Va. Dept. of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995)(en banc).

---

any other employee. Moreover, although the EEOC and LaRaviere-Steele will be able to explore at trial the import of the code listed for LaRaviere-Steele being listed as "personality conflict" and her being told she was no longer a "good fit," these reasons are not inherently inconsistent with the performance problems Safelite has detailed in its memoranda.

In this case, Defendants contend there is insufficient evidence as a matter of law to establish the third element: the severity or pervasiveness of the offending conduct. Defendants also argue Safelite is entitled to judgment on the basis of the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 724 (1998)

### 1. Severe or Pervasive

As noted above, the third requirement of a Title VII hostile work environment claim is proof that the harassment is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)(internal quotation marks omitted and alteration in original). This "severe or pervasive" element has both subjective and objective components. *Harris*, 510 U.S. at 22. First, the plaintiff must show she subjectively perceived the environment to be abusive. *Id.* "Next, the plaintiff must demonstrate that the conduct was such that 'a reasonable person in the plaintiff's position' would have found the environment objectively hostile or abusive." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)(quoting *Oncale v. Sundowner Offshore Serv.*, 523 U.S. 75, 81 (1998)).

Here, Defendants argue the EEOC and LaRaviere-Steele have failed to proffer sufficient evidence to establish either the subjective or objective components of the severe or pervasive requirement. With regard to the first component–the subjective component–it is well-settled that if a plaintiff "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21-22. Defendants argue that the undisputed facts show that LaRaviere-Steele did not subjectively view Byrd's conduct to be abusive, because (1) she did not always find Byrd's

17

comments to her to be offensive; (2) she "rarely" removed herself from Byrd's presence when he acted inappropriately; (3) she continued to take smoke breaks with him in his truck; (4) she failed to report Byrd's conduct to anyone at Safelite for over a year; (5) she asked for her job back after she was terminated; (6) she failed to proffer evidence that the conduct interfered with her ability to perform her job, and (7) she did not suffer any psychological harm from the conduct. Defendants rely on *Highlander v. K.F.C. National Management, Inc.*, 805 F.2d 644 (6th Cir. 1986) to support their arguments.

In *Highlander*, the plaintiff, an assistant-manager at a restaurant, claimed that three separate sexually offensive incidents resulted in a sexually hostile work environment. The first occurred when a district training manager, who had no supervisory power over Highlander, commented she was wearing a "chic" uniform and touched her legs, buttocks, and nametag located over her breast. Highlander reported the incident to a manager, but stressed she did not want to make "a big stink about it" and did not "think it was that big of a deal." 805 F. 2d at 646. The second incident occurred after she invited her supervisor for a drink to discuss her promotion possibilities. The supervisor declined, but placed his arm around Highlander and told her that if she was interested in a promotion, "there is a motel across the street." *Id.* Highlander did not report this incident until three months later, although her husband complained to management prior to that date. Finally, Highlander contended that crude conversation pervaded the restaurants in which she worked. *Id.* at 650. The Sixth Circuit Court of Appeals affirmed the trial court's entry of judgment for Highlander's employer after a trial on the merits, concluding that "Highlander failed to demonstrate that she was offended in any significant way by the asserted incidents and that the incidents, if in fact they occurred, had the effect of unreasonably interfering with the plaintiff's work performance or created

18

an intimidating, hostile, or offensive work environment that seriously affected her psychological well-being." *Id.*

This court finds the facts of this case–and in some respects, the applicable law–to be distinguishable from *Highlander*. First, the *Highlander* court relied on Sixth Circuit precedent which *required* proof that the abusive environment "affected seriously the psychological well-being of the plaintiff." *Id.* at 649 (quoting *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619-20 (6th Cir. 1986)). In *Harris*, however, the Supreme Court held that to be actionable under Title VII as an abusive work environment, allegedly harassing conduct need not seriously affect an employee's psychological well-being. 510 U.S. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived as hostile or abusive . . . there is no need for it also to be psychologically injurious."). Thus, to the extent that *Highlander* can be read as requiring psychological injury to show the subjective component of the "severe or pervasive" element, it is no longer good law.

Second, contrary to Defendants' perception of the facts of record, LaRaviere-Steele did not "rarely" remove herself from Byrd's presence when he allegedly acted inappropriately. LaRaviere-Steele's testimony establishes that she removed herself from Byrd's presence on many occasions after he engaged in inappropriate discussions or touching. *See* Dep. of LaRaviere-Steele [DE-44-2] at pp. 182 (walking out after Byrd asked her the color of her panties); 182-83 (getting out of his truck when he asked her the color of her panties); 184 (leaving the copy room and the plant facility after Byrd tried to kiss her); 190-91 (walking out of Byrd's office when he ran his finger up her pantleg) 194(walking away when he told her she looked damn good); 195 (getting out of Byrd's truck when

he said he wanted to touch her breasts); 200 (leaving hotel room when Byrd attempted to pull her on the bed); 217-18 (getting out of Byrd's truck when he attempted to kiss her and touch her breast). Nor does the fact that LaRaviere-Steele initially found some comments about her eyes or attractiveness innocuous mean that she was not offended by Byrd's later comments about her underwear and anatomy or his sexual overtures to her. These contentions, and the remaining arsenal of Defendants' arguments regarding subjectivity, will of no doubt be of interest to a fact-finder, but they do not establish, as a matter of law, that LaRaviere-Steele did not find her work environment to be subjectively hostile. It is up to the fact-finder, and not this court, to weigh the credibility of LaRaviere-Steele's testimony. Unlike the trial court and the Sixth Circuit Court of Appeals in *Highlander*, this court will not make a credibility determination. *See Highlander*, 805 F.2d at 650 (noting that the court was explicitly "[c]onsidering the trial court's reluctance to assign credibility to Highlander as a witness").

With regard to the objective component, "[t]here is no 'mathematically precise test' for determining if an environment is objectively hostile or abusive." *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 328 (quoting *Harris*, 510 U.S. at 22). Rather, a court must consider "all the circumstances," including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Moreover, such an analysis requires "careful consideration of the social context" in which the alleged discrimination occurred. *Oncale*, 523 U.S. at 81. Nevertheless, a single incident of sexual harassment can be actionable if it is "extraordinarily severe." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 n.5 (4th Cir. 2011). "In the Fourth Circuit, the question of whether harassment was sufficiently severe or

20

pervasive is quintessentially a question of fact." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010)(internal citations, quotations, and alterations omitted). Still, Title VII is not meant to "become a general civility code" and courts should seek to "filter out complaints attacking the ordinary tribulations of the workplaces, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 755, 787 (1998)(internal quotations and citations omitted).

Here, Defendants argue that EEOC and LaRaviere-Steele have proffered insufficient evidence to show that Byrd's conduct was objectively severe or pervasive.[4] The court disagrees. The evidence, viewed in the light most favorable to EEOC and LaRaviere-Steele, shows that Byrd (1) twice attempted to kiss LaRaviere-Steele; (2) once attempted to touch her breasts; (3) twice placed his fingers near her back to feel for the clasp of her bra; (4) placed his finger on the inside of her thigh and moved it up her leg to within five inches of the zipper of her pants; and (5) attempted to pull her onto a bed with him. Additionally, he made comments to LaRaviere-Steele, including: (1) telling her on multiple occasions she looked "pretty, "sexy," or "damn good;" (2) asking her on at least two occasions whether she was "gray down there;" (3) making at least two comments about her breasts; and (4) asking her on two occasions the color of her panties. Although this conduct occurred over a period spanning a little more than a year, the inappropriate comments and personal

---

[4] Defendants' memoranda suggest they are advocating that the EEOC and LaRaviere-Steele must prove that the conduct was both severe *and* pervasive. It is well-settled, however, that the "severe or pervasive" requirement is in the disjunctive. *See, e.g., Harris v. Mayor and City Council of Baltimore*, 429 Fed. Appx. 195, 201 n.7 (4th Cir. 2011)(noting the appellee's brief described the element in the conjunctive and explaining that "[o]ur precedent makes clear, however, that the element is properly viewed in the disjunctive, requiring only that a plaintiff prove the harassment was severe *or* pervasive.")(emphasis in original). To the extent Defendants rely on the unpublished order from this court, *EEOC v. TJX Cos.*, No. 7:07-cv-66-F, 2009 US Dist. LEXIS 4547 (E.D.N.C. Jan. 22, 2009), to support the conjunctive argument, the court merely misspoke in that order.

inquiries about LaRaviere-Steele's anatomy, underwear, and appearance, coupled with Byrd's physical advances to LaRaviere-Steele, amount to severe or pervasive conduct. *See Okoli*, 648 F.3d at 221 (concluding that a plaintiff presented a strong claim for a hostile work environment where the evidence showed that over the course of four months she was subjected to her supervisor kissing her, propositioning her, describing his sexual activities, and asking her intimate questions); *Beardsley v. Webb*, 30 F.3d 524, 528-29 (4th Cir. 1994)(finding a hostile work environment when, over six months, a supervisor massaged an employee's shoulders, stated he wanted to "make out" and "have his way" with her, falsely accused her of having an affair, and asked her about her underwear, birth control, and the bodily effects of taking maternity leave); *Whitten v. Fred's Inc.*, 601 F.3d 231, 242-43 (4th Cir. 2010)(explaining that where a manager twice passed behind the plaintiff and pressed his genitals against her and subjected her to verbal abuse it was sufficient to establish the "severe or pervasive" element).

The court finds the two cases upon which Defendants otherwise rely–neither of which come from within this circuit–to be distinguishable. First, in *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871 (5th Cir. 1999), the only physical contact alleged was by a co-worker who "touched [the plaintiff's] arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her." *Id.* at 872. The physical contact in the instant case, however, goes beyond a few incidents of touching someone's arm. Second, this case is distinguishable from *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333 (7th Cir. 1993), where a supervisor asked an employee out on dates, called her a "dumb blond," touched her shoulders several times, posted "I love you" signs and once tried to kiss the employee at a bar. *Id.* at 334. Here, Byrd attempted to kiss LaRaviere-Steele on more than one occasion, attempted to

fondle her breasts, touched her in an intimate and invasive way on her leg, and attempted to pull her onto a hotel bed.

In sum, when the record is viewed with an eye toward the totality of the circumstances, there is sufficient evidence from which a reasonable jury could find that LaRaviere-Steele was subjected to severe or pervasive harassment.

### 2. *Ellerth/Faragher* Defense

Safelite argues that even if the EEOC and LaRaviere-Steele can show conduct which was severe or pervasive, it is still entitled to judgment as a matter of law on the basis of the affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

In *Faragher* and *Ellerth*, the United States Supreme Court set forth the standards to be used to determine when an employer may be held liable for a supervisor's sexually harassing conduct. "First, when a supervisor's sexual harassment of an employee culminates in a 'tangible employment action," such as discharge, demotion, or undesirable reassignment, the employer is liable for the harassment, regardless of whether the employer knew or should have known of the harassment and regardless of whether the employer took remedial steps to end the harassment after learning of it." *Reinhold v. Commonwealth of Virginia*, 151 F.3d 172, 174-75 (4th Cir. 1998). "Second, where the employee does not suffer a tangible employment action, but rather suffers an actionable hostile environment based on sex, the employer is still vicariously liable for the hostile environment created by its supervisor, *unless* the employer can prove by a preponderance of the evidence: (1) that the employer exercised reasonable care to prevent and correct any sexually harassing behavior; and (2) that the employee 'unreasonably failed to take advantage of any preventative or corrective

23

opportunities to avoid harm.'" *Id.* at 175 (quoting *Ellerth*, 524 U.S. at 764). Safelite argues that under this rubric, it is entitled to judgment as a matter of law because (1) Byrd's alleged harassment of LaRaviere-Steele did not "culminate" in her termination, and (2) the record evidence establishes that Safelite took reasonable care to prevent and correct any sexually harassing behavior and LaRaviere-Steele unreasonably failed to take advantage of Safelite's preventative and corrective procedures.

The court, however, cannot rule that Safelite is entitled to judgment as a matter of law on the basis of the affirmative defense, because a genuine issue of material fact exists as to whether Byrd's alleged harassment culminated in LaRaviere-Steele's termination. In order to establish that harassment "culminated" in a tangible employment action, a plaintiff must show a causal relationship between the harassment and the action. *Jaudon v. Elder Health, Inc.*, 125 F.Supp.2d 153, 161 (D.Md. 2000)(citing *Johnson v. West*, 281 F.3d 725, 731 (7th Cir. 2000); *Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 956 (9th Cir. 1999); *Fierro v. Saks Fifth Avenue*, 13 F.Supp.2d 481, 491 (S.D.N.Y. 1998)). *See also Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004)(concluding that in a constructive discharge case the *Faragher/Ellerth* defense is unavailable where a supervisor's conduct "precipitates" the tangible employment action); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006)("The word 'culminate' requires that the tangible employment action be linked to the supervisor's discriminatory harassment."); *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998)(noting that if a plaintiff's termination did not "result from" a refusal to submit to a supervisor's sexual harassment, the employer may assert the *Faragher/Ellerth* affirmative defense). Safelite argues this causal relationship cannot be established for the same reasons it contends the retaliation claims are deficient. This court, however, already has concluded

24

that a jury could find that Byrd's termination of LaRaviere-Steele's employment was motivated by

retaliatory intent on the part of Byrd in the face of her complaint about his alleged harassing conduct.

A jury could therefore find that Byrd's decision to terminate LaRaviere-Steele was linked to Byrd's

alleged harassment, and that the harassment indeed "culminated" in her termination. *See e.g. Bennett*

*v. Progressive Corp.*, 225 F.Supp.2d 190, 204-05 (N.D.N.Y. 2002)(determining that factual issues

over the "culmination" issue should be reserved for the jury where the plaintiff contended she was

terminated for making a complaint about her supervisor's harassing conduct but the employer

proffered evidence showing plaintiff was terminated for violating alcohol policy). Given the genuine

issues of material fact surrounding LaRaviere-Steele's termination and Byrd's knowledge of her

sexual harassment complaint, the court cannot rule, as a matter of law, that Byrd's alleged

harassment of LaRaviere-Steele did *not* culminate in a  tangible employment action.  Safelite's

Motion for Summary Judgment is therefore DENIED as to the EEOC and LaRaviere-Steele's Title

VII harassment claims.

## C.  Wrongful Discharge under North Carolina Common Law

LaRaviere-Steele, in her capacity as Plaintiff-Intervenor, alleges a claim for wrongful

discharge in violation of the common law of North Carolina against both Byrd and Safelite.

Under North Carolina law, in the absence of a contractual agreement between an employer

and its employee establishing a definite term of employment, the employment relationship is

presumed to be terminable at the will of either party at any time and without reason.  The North

Carolina Supreme Court, however, has recognized a limited public policy exception to this doctrine,

which provides that while there may be "a right to terminate a contract at will for no reason, or for

an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful

reason or purpose that contravenes public policy." *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989)(quotation omitted).

Under North Carolina General Statute § 143-422.2, known as North Carolina's Equal Employment Act ("NCEEPA"):

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age , sex or handicap by employers which regularly employ 15 or more employees.

*Id.* Based on the NCEEPA, North Carolina courts have recognized an exception to the at-will employment rule for a claim for wrongful discharge in violation of public policy based on allegations that a plaintiff was fired because of her sex. *See, e.g. Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995)(recognizing a plaintiff could assert a claim for wrongful discharge on the basis of her sex in violation of the public policy enunciated in the NCEEPA). At the same time, North Carolina courts have steadfastly refused to infer a private right of action under NCEEPA for sexual harassment, at least in the absence of a wrongful discharge, or pure retaliatory discharge. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000)(refusing to create a private right of action for sexual harassment under NCEEPA and recogning that "most courts have applied the NCEEPA only to common law wrongful discharge claims"); *Leach v. Northern Telecom, Inc.*, 141 F.R.D. 420, 426 (E.D.N.C. 1991)(concluding plaintiff failed to state a claim that her employer wrongfully discharged her in violation of the NCEEPA where she alleged she was terminated because of "her opposition to what she believed in good faith to be a number a sexually discriminatory employment practices by" her employer).

Although there is no private right of action for sexual harassment under NCEEPA, and courts have not found that NCEEPA is violated when an employee is terminated on the sole basis of

retaliation, the Fourth Circuit has held that North Carolina law recognizes a claim for wrongful discharge in violation of the NCEEPA "where an employee is fired for refusing to consent to the sexual advances of the employer." *McLean v. Patten Communities, Inc.*, 332 F.3d 714, 720 (4th Cir. 2003). LaRaviere-Steele argues the evidence she has proffered brings the instant case within the realm of *McLean*, while Safelite[5] contends the allegations in her Amended Complaint only reference retaliation, and she cannot now amend her complaint through her brief opposing summary judgment.

The court finds it useful to first examine the facts of *McLean*, which the undersigned presided over both before and after the Fourth Circuit's 2003 opinion. In *McLean*, the plaintiff was "subjected to all manner of propositions, indignities and insults based on race or sex or both" from her supervisor. 332 F.3d at 716. The plaintiff rebuffed her supervisor's advances and eventually complained to members of management about the conduct of her supervisor, after which the supervisor "not only cooled toward [plaintiff], but affirmatively undertook to make her employment so difficult and uncomfortable that she would resign." *Id.* at 718. Thus, the complaints to management were part of the plaintiff's refusal "to accede the sexual advances of her supervisor." *Id.* at 721.

So it is here. The court does not agree with Safelite's assertion that LaRaviere-Steele is belatedly trying to recast a retaliation claim into a wrongful discharge claim. Rather, it is apparent that LaRaviere-Steele has consistently maintained that her termination was the "culmination" of the alleged sexual harassment by Byrd and that it was retaliatory. In other words, her complaint to

---

[5] The court agrees with Defendants' argument that a wrongful discharge claim may only be brought against an employer, not individual employees. *Hooper v. North Carolina*, 379 F.Supp.2d 804, 814 (M.D.N.C. 2005)(citing *Sides v. Duke Hosp.*, 74 N.C. App. 331, 343, 328 S.E.2d 818, 826-27 (1985)). LaRaviere-Steele's claim against Byrd for wrongful discharge is therefore DISMISSED.

27

Roach was her final effort to rebuff Byrd's actions and sexual advances. *See Townsend v. Shook*, 323 Fed. Appx. 245, 251 (4th Cir. 2009)(unpublished)(explaining that "[t]he distinguishing feature between the claim disallowed in *Smith* and the claim allowed in *McLean* is that the claim allowed in *McLean* alleged a wrongful discharge because of the plaintiff's refusal of sexual favors to her supervisor, while the claim disallowed in *Smith did not allege a wrongful discharge, just sexual harassment*")(emphasis added). Under these facts, the court finds that LaRaviere-Steele has proffered sufficient evidence from which a jury could find that she was wrongfully discharged on the basis of her sex in violation of the public policy of North Carolina.

## D. Intentional Infliction of Emotional Distress

Safelite also moves for summary judgment on LaRaviere-Steele's claim for intentional infliction of emotional distress. Under North Carolina law, the essential elements of this tort are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe and emotional distress to another." *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). "The tort may also exist (I looked up case and verified this) where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." *Id.* at 452, 276 S.E.2d at 335. In this case, Defendants contend LaRaviere-Steele has failed to proffer sufficient evidence to establish any of the three elements.

Conduct is extreme and outrageous when it is " 'so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Briggs v. Rosenthal*, 73 N.C. App. 483, 493, 340 S.E.2d 116, 123 (quoting Restatement (Second) of Torts §46). "North Carolina courts rarely 'find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim

28

of intentional infliction of emotional distress.' " *Smith v. Computer Task Group, Inc.*, 568 F.Supp.2d 603, 621 (M.D.N.C. 2008)(quoting *Thomas v. N. Telecom, Inc.*, 157 F.Supp.2d 627, 635 (M.D.N.C. 2000) and citing *Locklear v. Person County Bd. of Educ.*, No. 1:05CV00255, 2006 WL 1743460, at **15-16, (M.D.N.C. June 22, 2006); *Jackson v. Blue Dolphin Commc'ns of N.C., LLC*, 226 F.Supp.2d 785, 794 (W.D.N.C. 2002); *Haburjak v. Prudential-Bache Sec., Inc.*, 759 F.Supp. 293, 302-03 (W.D.N.C. 1991)(listing state court cases)). Where sexual harassment is the conduct underlying a claim for intentional infliction of emotional distress, however, North Carolina courts have found such conduct to be extreme or outrageous where the evidence shows:

> an unfair power relationship between defendant and plaintiff; explicitly obscene or "X rated" language; sexual advances towards plaintiff; statements expressing desire to engage in sexual relations with plaintiff, or; defendant either touching plaintiff's private areas or touching any part of the plaintiff's body with his private parts.

*Guthrie v. Conroy*, 152 N.C. App. 15, 23, 567 S.E.2d 403, 410 (2002).

With regard to the third element "severe emotional distress," North Carolina courts have defined the term to mean "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professional trained to do so." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Although "[t]he crux of establishing 'severe emotional distress' is that the emotional or mental disorder *may generally be diagnosed by professionals trained to do so* . . . an 'actual diagnosis' by medical professional is not always required or necessary." *Soderlund v. Kuch*, 143 N.C.App. 361, 371, 546 S.E.2d 632, 639 (2001)(emphasis in original).

In this case, Plaintiff proffers admissible evidence, in the form of her own testimony, that (1) she stayed in bed; (2) she did not want to eat; (3) she did not want to get dressed; (4) she did not

want to play with her child; (5) she was crying all the time; (6) she stopped going in public and socializing with others; (7) she withdrew from her husband and avoided physical contact with him; (8) she suffered body aches and chest pains; (9) she had trouble sleeping and began using sleeping pills; and (10) she attempted suicide by ingesting approximately 30 sleeping pills during the late summer or early fall of 2009. Dep. of LaRaviere-Steele [DE-44-2] at pp. 29-32. The court will assume, for purposes of this motion, that LaRaviere-Steele's testimony is sufficient to allow a jury to find that she suffered from severe and emotional distress. The court also will assume that Byrd's alleged sexual harassment of LaRaviere-Steele could constitute extreme and outrageous conduct. Nevertheless, LaRaviere-Steele's claim for intentional infliction of emotional distress still fails because she has not proffered evidence to establish the second element: causation. Specifically, although LaRaviere-Steele's testimony makes clear Byrd's alleged conduct made her unhappy and at times upset during her employment at Safelite, her testimony also makes clear that her symptoms of severe emotional distress manifested only after she was terminated, and in fact stemmed from her reaction to her termination. Dep. of LaRaviere-Steele [DE-44-2] at pp. 17-33. That is, the extreme and outrageous conduct did not cause LaRaviere-Steele's severe emotional distress. Her termination from employment did. A wrongful or retaliatory termination, however, does not constitute "extreme or outrageous" conduct. *See Smith*, 568 F.Supp.2d at 621 (noting that retaliatory termination cases arising under North Carolina's Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-241 rarely constitute "extreme or outrageous" conduct); *Laing v. Federal Express Corp.*, No. 3:10-CV-00242, 2011 WL 6072028, at *9 (W.D.N.C. Oct. 13, 2011)("A wrongful, even retaliatory termination does not rise to the level of extreme and outrageous conduct."). Defendants' motion for summary judgment is ALLOWED as to LaRaviere-Steele's claim for intentional infliction of

emotional distress.

**E. Negligent Infliction of Emotional Distress**

Defendants also seek judgment on LaRaviere-Steele's claim for negligent infliction of emotional distress. A claim for negligent infliction for emotional distress requires evidence showing that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . and (2) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson*, 327 N.C. at 304, 395 S.E.2d at 97.

With regard to LaRaviere-Steele's claim against Byrd, her allegations and projection of facts identify only his intentional retaliatory conduct in terminating her employment as the cause of her distress. Intentional conduct, however, cannot form the basis of a claim for negligent infliction of emotional distress. *See Bratcher v. Pharm. Product Dev., Inc.*, 545 F.Supp.23 533, 545 (E.D.N.C. 2008)(citing *Mitchell v. Lydall, Inc.*, No. 93-1374, 1994 WL 38703, at *3 (4th Cir. 1994)(per curiam). With regard to her claim against Safelite, the record before the court shows that LaRaviere-Steele has failed to create a genuine issue of material fact on whether her severe emotional distress was a reasonably foreseeable result of her allegedly wrongful termination. *See Smith*, 568 F.Supp.2d at 623-24. Defendants' motion for summary judgment is therefore ALLOWED as to LaRaviere-Steele's claim for negligent infliction of emotional distress.

**F. Loss of Consortium**

Finally, Defendants contend they are entitled to summary judgment on Darrell Steele's claim for loss of consortium. Their sole argument is that Darrell Steele's loss of consortium claim is derivative in nature and wholly depending upon the survival of LaRaviere-Steele's state law tort claims. *See Bostic v. Rodriguez*, 667 F.Supp.2d 591,615 (E.D.N.C. 2009).

31

The argument is applicable and persuasive as to Darrell Steele's loss of consortium claim against Defendant Byrd; none of LaRaviere-Steele's state law tort claims have survived summary judgment. Accordingly, Darrell Steele's claim for loss of consortium is DISMISSED as to Defendant Byrd. LaRaviere-Steele's wrongful discharge claim against Safelite has survived summary judgment, however, and provides a supporting basis for Darrell Steele's claim for loss of consortium, and the motion for summary judgment is therefore DENIED as to that claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DE-37] is ALLOWED in part and DENIED in part. Plaintiff-Intervenor LaRaviere-Steele's claim for wrongful discharge against Defendant Gregory K. Byrd and her claims for intentional and negligent infliction of emotional distress against both Defendants are DISMISSED.[6] In all other respects, the Motion is DENIED.

This matter is presently set for trial on the undersigned's term of court commencing on September 4, 2012. The court is cognizant that the parties conferred regarding preferred trial dates prior to requesting the undersigned's September 2012 term of court. Unfortunately, the evidentiary hearing in *United States v. Jeffrey MacDonald*, 3:75-cr-26-F, has had to be continued until September 17, 2012 and is anticipated to last two weeks. Accordingly, the trial in this matter is CONTINUED until the term of court commencing on October 1, 2012.

---

[6] Accordingly, all claims against Defendant Gregory K. Byrd have been dismissed.

32

SO ORDERED.   This the 9ᵗʰ day of August, 2012.

James C. Fox
Senior United States District Judge

33